Okay, the next case is number 21, 1662 Adams against the United States. Ms. Elkin. Good morning. May it please the court. My name is Molly Elkin. I'm very proud to be here today on behalf of 188 correctional officers who have risked their lives during the course of this global pandemic as they worked with or in close proximity to the coronavirus, the novel coronavirus, an unusual hazard, one that they worked with and in close proximity to, while the rest of us were safe at home, wiping down our groceries on our front porches, practicing social distancing, and doing oral arguments by Zoom. Your Honors, there can be no doubt that plaintiffs have stated a claim for relief and that the lower court's decision should be reversed. Let us put on our proof. To survive a motion to dismiss, we just have to put in our complaint, factual matter, sufficient factual matter, which accepted as true, states a claim for relief, and we have met this lenient standard. As this court knows, the latch on the Rule 8 gate is a loose and forgiving one. This wasn't a motion to win. This was a request to get out of the gate. It's a complaint, and the court below erred in locking us out. The parties actually agree on what needs to be in the complaint for hazardous duty pay and for environmental differential pay, and we have put in the complaint what needs to be there. For HDP, we had to allege that the employees worked with or in close proximity to virulent biologicals. I think the Court of Federal Claims ruled against you because the court found the Adair case to be dispositive of this particular issue. Can you address Adair? Yes, sir. The Court of Federal Claims did rule against us because it found Adair to be positive. That was just one of the flaws in the Court of Claims case, that the case was severely flawed on very many levels. I think the most obvious flaw is that the court found that the coronavirus was not an unusual hazard. There's nothing unusual about it, and the Court of Federal Claims said it's the same thing as secondhand smoke that was addressed in Adair. Well, the court was wrong about that. When is the last time this country, the world, was shut down because of secondhand smoke? When is the last time that we were required to wear masks and sit behind these glass things because of secondhand smoke? When is the last time we were told to work from home because of secondhand smoke? When is the last time we didn't let our kids see their grandparents for more than a year for fear that our kids would kill, accidentally, our parents because of exposure to secondhand smoke? As I understand it, we have to work through these OPM regulations and figure out whether the coronavirus exposure in these prisons qualifies as defined by these regulations, whether it might be unusual fiscal hardship or unusual hazard, right? That is correct, Your Honor. So, as I understand what Judge Leto did, he said, the definition for hazard duty is something where you're engaged in some activity, and if there's an accident, then you could really hurt yourself. And what's going on here is not in the nature of that kind of accident conception provided in the hazard regulation. And, Your Honor, he was wrong because if you look at what the Congress said about hazardous duty pay, you're entitled to hazardous duty pay if you are subjected to an unusual hazard in the workplace. If your assignments require you to be subjected to an unusual hazard. And in this case, we have met the definition of the biological within the regulation. It is defined as materials of microorganic nature, which, when introduced into the body, will likely cause serious disease or death and for which protective devices do not offer complete protection. We've met that definition. The Oxford definition of microorganism is materials of microscopic nature, especially bacterium, virus, or fungus. Even the government believes that the coronavirus is a microorganism and a virulent biological for purposes of... And I guess my question to you would be, why can we read that Appendix A provision about virulent biologicals without considering the context of what the overall backdrop definition of hazard duty is provided in the regulation, which talks about it's got to be an accident? Well, the regulation doesn't state that it has to be an accident. And the statute doesn't state that it has to be an accident. I just... All it requires in the regulation itself is work with or in close proximity to a virulent biological. The accident stuff comes from the toxic chemical regulation that the Adair court was assessing in Adair. That is not an issue here. Toxic chemicals... We're not alleging we were exposed to toxic chemicals. And the court in Adair... Your Honor, Judge Reyna, you asked this earlier. Adair does not preclude us from putting on this case. Adair never mentioned virulent biologicals. Adair never defined virulent biologicals. It wasn't an issue. Instead, the court was considering whether secondhand smoke fits within the toxic chemical category, which does talk about accidents. And so the toxic chemical regulation, the court said, it doesn't fit. Secondhand smoke is not a toxic chemical because toxic chemicals, as defined in the regulation, means something that would have a possibility of spillage or leakage. The court looked at secondhand smoke. There's no possibility of spillage or leakage. And so the court based its decision on the Adair court on the regulations plain language that talks about spillage or leakage. Same thing when it looked at the EDP, the environmental duty regulation. The court looked at that regulation and toxic chemicals in that regulation has to be something that's generated from work, like chemicals that are generated from work processes. And the court said, this is not that. This is secondhand smoke. It's completely different. And if you go back and look at the statute, it is not an unusual hazard. Isn't there a primary question here as to whether Danbury is any different from the federal prisons around the nation? Do you know the status? Because we know in some states, I'm thinking of New York, the prisons have been identified as being in a particularly hazardous situation. And as I understand it, there is some sort of controversy nationally about all federal prisons. Do you know anything about that? Well, your honor, this case right now is just about the 188 correctional officers at the Danbury prison. But the other federal prisons, I would argue, they're the same situation. They are the same situation as this area. And if we have to prove, you know, the government comes up with this scientist's rule that just doesn't exist in the regulations. What the government's primary argument is that in order to state a claim for relief for exposure to a virulent biological, we actually have to allege that these workers worked in a lab or that they worked with biological experimentation. That's not in the regulation. There is no scientist's rule. But if we're allowed to put on our case, judge, you asked about a prison. I think it's going to be the same in every federal prison. We will be able to show that these workers not only worked with a Petri dish or a vial of coronavirus. Not that we ever have to show it. It's not in the regulations, not in the statute. But we will be able to show that in this federal prison and in perhaps other federal prisons, but that's not before you now. In this federal prison, these workers were working in the Petri dish. In the Petri dish. When we filed this complaint, judge, there were 100 cases of coronavirus at that prison, at FCI Danbury. The Bureau of Prisons keeps track of the coronavirus cases. Now there's 234. More than doubled during the course of the pandemic. If you let us put on our case, we can show you that in December of 2020, at the female facility at FCI Danbury, it's a facility that housed at that point 50 inmates. 34 of those inmates. 34 of those inmates had coronavirus. If you let us put on our proof, we can show you that any time a correctional officer was assigned to that location in December of 2020, they were assigned to work with coronavirus. If they were assigned to guard the inmates, feed the inmates, counsel the inmates. There's really no meaningful difference between the government's argument, these examples of working with the vial of coronavirus. This statute and set of regulations have been around for several decades. Are you aware of any example of a situation where virulent biologicals, as defined for hazard duty pay, was applied for something like an infectious disease or for something that wasn't handling some actual dangerous virus in a lab? Yes, Your Honor. I am aware of a case. It's a case called Abbott versus the United States. And in that case, which was in the 90s, I believe, the claims were claims of Border Patrol agents who worked along the southern border. And their jobs were to apprehend undocumented individuals who were crossing the border. That happened to be on the border of the New River and the Tijuana River. And the allegation in that complaint was that when the Border Patrol agents are required to apprehend undocumented individuals that happened to cross into this country through those rivers, which contained coliform, I believe it's called, which were virulent biologicals, they were entitled to hazardous duty pay. And the government said, no, you have to actually hold a vial. You actually have to be exposed to an actual hazard. And Judge Hewitt in the Court of Federal Claims said, no, no, no, you don't. Under the statute, all you have to show is that the employee is subjected to an actual hazard. And in that case, Judge Hewitt concluded that the Border Patrol agents had a well-pled complaint when they alleged they were entitled to hazardous duty pay for working in and around these contaminated rivers. Not that they were ever assigned to go in the water and test the water. They never were assigned to actually touch the water. They were not assigned to do anything with that water except do their actual job duties. In this case, under hazardous conditions, because they were... Counselor, is it your argument that everybody who works in the prison or a prison is involved in hazardous duty? Your Honor, I'm here before you on behalf of these 188 employees. But I believe the facts will show that in these other prison cases out there, that those employees were working with and in close proximity to coronavirus in the prison during COVID outbreaks. And... Everybody? Well, not every day, perhaps. It just depends on the worker's assignment. If the worker, the example I gave, was assigned to work in that female housing unit where 34 of the 50 inmates were positive. Oh yeah, they've stated a claim for relief. And as the Adair Court pointed out, the legislative history supports that. When the statute was passed in the 1966 or so, there was testimony before Congress. And Chairman Lacey said to the Congress, in these situations where employees are performing their regular duties, such as these correctional officers, he didn't say correctional officers, but they're performing these regular duties under hazardous conditions, there should be extra pay for that. And that is the situation in this prison and perhaps other prisons. This is not a case about all federal workers. But when you're in a prison, you don't get the social distance. There's no social distancing. Their job is to be proximate to the coronavirus vial. And when I'm saying the coronavirus vial, I'm talking about the inmate infected with this disease. Their job is to be next to them. Their job is to pat them down. So in before times, in before times, their assignment was to pat down inmates to search for contraband. Now, in my experience of prisons and jails and in my prior career, and even in this one, I've toured prisons and all, it doesn't seem to me that everybody's got the same job, that everyone's exposed to the prisoners. You may have somebody who comes into work and handles correspondence or is in the front office and would they be included in the 188? Your Honor, let us put on our case. That's a case for discovery. That's an issue on summary judgment. Whether we can prove that every single employee was exposed to a risk or a hazard is a question for another day. We have pled what we needed to plead in this case. And perhaps the secretary who never goes right to her desk and gets to wear a mask and sits behind the plastic and doesn't ever have to touch other equipment or touch inmates or break up fights or respond to body alarms, perhaps that person doesn't have a claim. At least, you know, we don't know yet. We haven't done the discovery. We were kicked out before we had a chance to get expert witnesses to talk about what it means to be exposed to the coronavirus. We were kicked out before we had a chance to get the daily assignments of all the workers to find out when the inmates had COVID. We'll be able to figure out damages, which is basically what you're asking. It seems to me that the court construed parts of the statute and regulations in a way that the very key parts, right, that we're dealing with in this case. If there's been a construction, if we reverse that, aren't we pretty much giving carte blanche to the issue, to your remedy that you seek? And I'm talking, it seems to me that the court construed hazardous duties, unusual and unusually severe, and that type of language. And your honor, we would argue that it is our, we have done what we needed to do in order to get into court to explain why it is when you're in a prison, which is not built for social distancing, it's crowded, it's hands-on work, it is not built for patients, it is not built to house highly contagious individuals. It's an institution behind thick walls. There's no ventilation. It's not like these correctional officers can open up the windows, open up the doors, and get some fresh air in there. Then all the bad guys leave. That's not what it's, that's, this is a prison. So I don't, I think, to answer your question, Judge, in this case, under these unique circumstances, you would not be overturning a dare. You would be allowing us to put on our case to prove that these individuals, based on the nature of the pandemic and this highly contagious disease, and their hands-on prison guard duties inside the institution, have stated a claim for relief under the hazardous duty pay regulations and the EDP regulations that are on the books now. You wouldn't be reversing anything. A dare does not require us to be kicked out of this court at all. It doesn't even once mention virulent biologicals, and it certainly doesn't define what the term with or in close proximity means. I see I'm out of time. Let's hear from the government, and we'll save you a lot of time. Mr. Love, Greg. Thank you. There's no dispute that the COVID-19 pandemic has brought new challenges for all types of workers, that many essential institutions couldn't function without them, but that's not what this case is about. This case is about whether these two very specific regulations concerning work with or in close proximity to virulent biologicals, or work within close proximity to microorganisms, apply in the scenario that's alleged here, where correctional staff are performing their ordinary duties, and those duties haven't changed, but what's changed is that some of the inmates and staff that they have contact with may be or are infected. With COVID-19, the existing regulations do not apply in these circumstances, and there's no existing category that does. The existing categories for working with microorganisms and virulent biologicals cannot be retrofitted to meet the circumstances that are presented here, because doing so would be inconsistent with their language, the overall program, and OPM's intent. Aren't those issues that would be decided by the court if the matter advances beyond the pleading stage? No, this case need not advance past the pleading stage, because what my friend just said is, well, we could show that they worked with Petri dishes, but then clarified, no, actually, we're going to show that they worked inside a metaphor for a Petri dish. We're going to characterize the prison as a Petri dish, or we're going to show that they work with vials, but they're not going to ... They're alleging that they're actually working with vials. They're alleging that we work with people, and people are vials, but that's not the case. People aren't vials. If you have one person that can communicate a disease to another, would you say, even metaphorically, that this person is a vial of that disease? No, and these are regulations that are not written in terms of metaphors. They have specific meaning. The operative phrase is, work with or in close proximity to, and in Adair, this court ... Well, of course, the regulations are not written in metaphors, but then again, all they have to do is state a plausible case. Yes, and they haven't done so here. What they've said, the activities that they're doing are not working with or in close proximity to virulent biologicals. They're working with or in close proximity to people. They involve ... But the people are the carriers. They are the Petri dish. But they're not Petri dishes. They're people.  In terms of communicating a disease and being a carrier of the disease, what difference is there between my having the disease here in this cup, putting it over there, and my sitting over here and breathing pathogens out on other people? Well, the distinction is the duty. I mean, that's what matters. You have to be assigned to and perform a specific duty. The distinction is what? Is the duty involved? Are you assigned to or perform ... Well, that's what they need to prove, right? Well, they certainly need to allege that. What they've alleged is that they perform their official duties. They've alleged it. Why don't they get a chance to prove it? Because they haven't presented any ... First of all, it's their job to allege in a complaint facts that would support this. What they've said is they perform their official duties. That's on page 29 of the appendix. On appeal, and today, they've clarified, well, we pat people down. We serve people food. We break up fights. We inspect and search bedding. We look for contraband. That's the duty. There is no category in Appendix A to either regulation to satisfy that. Now, what's interesting is what they're ... Let's think about this. Let's say I get up on a particular morning, and I decide whether to go to the store or not. If I go to the store, it may be because people are wearing a mask there, and I don't go to another because nobody is. I know there's social distancing down at the bank, so I'm going to go to the bank. Things of that nature. That's what I would be doing, and I don't have a duty for any of that. But if I have to get up and put on a uniform and drive to a prison where we know there's COVID cases there and the conditions of a prison as we know them, then why is that not a duty that falls under these regulations? Because what the duty that you've described is performing your ordinary duties as correctional employees. Yes, that's true. But you're performing your ordinary duties as an enforcement officer, and that gives you exposure to COVID, which you normally would probably not undertake. I would not go to a prison if I had an option to go to it because of this very reason. But there's people that have to get up in the morning and show up and go to work, partly because that's their job, that's their livelihood, but also it's their duty. And we appreciate that, and we acknowledge that a lot of these... Well, that's why we have hazardous pay, duty pay, and back pay. That's why we acknowledge that these folks are undertaking extraordinary measures in the performance of their duty, and we recognize that by saying we're going to give you hazardous pay and back pay if you're entitled to it. Well, the distinction, Your Honor, is that whether or not a particular duty is dangerous or hazardous or unusual, that's not where it ends. What you have to do is you have to go to the regulations and say, is there a regulation that qualifies, applies to these circumstances? Are you familiar with the OPM Memorandum 2020-05? Okay, and what does that say about COVID? Well, I mean... On the first page, for example, the Center for Disease Control and Prevention has determined that COVID-19 meets the definition for severe acute respiratory syndrome. Therefore, this novel coronavirus is a quarantinable, communicable disease. If you have this, you go into quarantine. And yet, if you work in a prison, you step into the confines of that quarantine. That might be a good reason for OPM to perhaps reconsider its regulations to address circumstances it didn't contemplate at the time that it promulgated these ones. And then let's look at page 11 of that same memorandum. Hazardous duty pay related to exposure to COVID-19. The question is, may an employee receive hazard pay differentials or environmental differential pay if exposed to COVID-19 through the performance of assigned duties? And the answer is yes. It goes on, it says, thus agency managers in consultation with occupational safety and health experts must determine whether an employee is entitled to hazard pay on a case-by-case basis. Why don't they get the chance to put on their case? Because what they've alleged or what they... Because they allegedly perform their official duties. The duties of correctional staff are not analogous to the duties associated with working with or in close proximity to virulent biologicals or microorganisms. And we know this because we have some context, we have meaning. In the environmental differential pay regulations, we have examples of what does this look like. And in Adair, the court in construing a parallel provision concerning work with or in close proximity to as applied to toxic chemicals, the same language, work with or in close proximity to that applies to microorganisms here. And it looked at those examples and said, we understand these aren't exhaustive. However, they reflect a certain type of assignment. These are assignments, these are scenarios in which an assignment requires an employee to work, you know, directly or indirectly with, you know, a toxic chemical as part of that job assignment. So, you know, applying that same reasoning and that same approach to this case, you know, we look at, well, have plaintiffs alleged that they are directly or indirectly doing anything with, you know, with pathogenic materials as part of a job assignment? And what we haven't heard ever is, yes, what we've heard is they are continuing to perform their duties. Those duties have become hazardous now. They weren't hazardous before. Therefore, we're entitled to payment. But that's not how these programs work. I did ask you if you were familiar with the memorandum because I didn't want to surprise you with it. Yes. Because I realize that this was not part of the record, but the court did refer to another section of the memorandum. So I, on that basis, I thought it would be fair to see if you were aware of the other part. And what the general takeaway is there, is there's, we've acknowledged there could be an assignment where an employee, you know, has to do something where that would meet the criteria for working with or in close proximity to a bureau. What would be that something? What's the definition? Well, I think that's the tough part, is that it probably doesn't arise all that often that somebody who doesn't have the knowledge and training to do that kind of work safely, you know, is going to be asked to do it. So I think that's why it says on some sort of case-by-case basis where the agency knows where they're assigning somebody to do this kind of work, you know, what that looks like and whether or not that qualifies. Right. I mean, as I understand that memo, it holds open the possibility that someone can collect hazard pay. Yes. But it doesn't expressly explain what that possibility is. And I'm asking you, can you just translate these regulations for us? What is the working principle behind how do we understand whether someone qualifies for hazard pay for a virulent biological? Can you just sum it up? Other than the example, I mean, looking at the examples, you know, what they all seem to have in common is that they are work, you know, somehow in support of biological. Examples are for the environmental differential pay microorganism. And also we're looking to the ones that OPM provided at the time it promulgated these regulations. And even though they're in the Federal Personnel Manual and the Federal Personnel Manual is no longer operative, this court in Schmidt and Markham has stated that it's a valuable resource when construing regulations that were promulgated when it was in effect. And when you look at that information, the background principles, what it says is this information is intended to assist agencies in identifying the types of work, the types of duty, the types of assignments that we intend these regulations to cover. And those are very specific. It's, you know, cultivating virulent organisms on artificial media. And, you know, it doesn't necessarily have to be a scientist necessarily. It could be an engineer. It could be someone performing autopsies. There are various contexts in which it arises. But what it doesn't arise in is a context where you're patting people down and you're searching their bedding. You know, no one says, you know, I'm searching bedding. I'm therefore working with virulent biologicals. You gave the example of going to a supermarket and you have the choice of whether or not you want to go. But if you do go, you went to the supermarket. That trip didn't suddenly transform that visit to a supermarket into you working with or in close proximity to virulent biologicals or microorganisms. You went to the supermarket and there was a new hazard that you had to prepare for. And that's very similar to the scenario here where people are going to work. Granted, a prison isn't a supermarket, but a prison isn't also a petri dish. It's a prison. So then getting back to COVID. Yes. What kind of federal employees could qualify for hazard pay for COVID? What would that look like? You're saying, OK, it's not this, it's not that. It's not the other thing. But what would qualify? Sure. Perhaps if somebody were performing some sort of experimentation where they had to harvest virulent tissue cultures from animals, it was outside of the scope of their normal job description. They don't have the knowledge and training to do it, but there's some sort of emergency and they have to rush in. So for that day, because they're understaffed and no one's available, that person would get it for the day. But I think the larger point is that these scenarios don't arise that much because the classification process is the mechanism by which people are compensated for doing these types of duties. The plaintiffs have an argument that if this is the case, that people who already have the knowledge and training to perform these types of duties with or in close proximity to microorganisms and virulent biologicals, well, then no one would get it. Well, that's not a problem. What that reflects is that the classification system is working correctly. Those are the types of people, the ones with the knowledge, skills, and training, that the government would want to be exposing themselves to assignments involving pathogenic microorganisms and bacteria and fungi themselves, not necessarily working with people and contacting people. What about Abbott, the claims court case from 20 years ago? Well, Abbott was decided 20 years ago before this court had the opportunity to evaluate the work... What happened to that case? It never came to the federal circuit. Is that right? That's correct. Thank you. So, is your sense that a favorable decision to this petitioner would resolve the question for the entire federal prisons throughout the nation? It would certainly provide guidance as to how the court views these regulations, and to the extent that the court says, yes, we agree, that to the extent that you report to a prison where people are infected, or they also say just potentially infected with COVID-19, that that's sufficient to state a claim under these regulations. Well, that would provide some very meaningful information with respect to how other cases should be treated, certainly. Any more questions? Okay. Thank you, Faisal. Thank you. Is that good? As Judge Tapp found in the identical case involving prison workers, a case involving correctional officers at FMC Lexington, also called Adams versus U.S., the government's reading of this regulation to only include the person on his off day whose job was not normally to harvest the cells of an infected animal who had coronavirus, and he did it on that day he gets his hazardous pay? Why did Congress bother passing this statute? Why did OPM bother writing this regulation if it's only for that one guy who doesn't even know how to harvest virus from an animal? It's an untenable reading, and as Judge Tapp concluded in this identical case, the government's narrow reading of the regulations would produce absurd results. It would gut the hazardous duty pay regulation because under the statute, as my colleague mentioned, if the hazard was taken into account in classifying the job description, you don't get this extra pay. So in the situation where somebody's job is to work in the lab and harvest the animal for cells or whatever he's doing, presumably that duty was taken into account when the position was classified. So the rule is untenable just as Judge Tapp found. The government's rule would also produce absurd results as a practical matter. So under the government's rule, a worker who is assigned to walk an infected test subject, coronavirus from one room to another, states a claim. But the inmates who are working in the Petri dish who are assigned, I'm sorry, the officers who are working in the Petri dish who are assigned to walk an inmate affected with coronavirus from the general population unit to a special housing unit, they don't state a claim. Case dismissed. That doesn't make any sense. It's an absurd result. The worker who is assigned but my clients who are assigned to clean out the cells of infected COVID-19 inmates, case dismissed, makes no sense and it's an absurd result. Same thing, feeding the laboratory animal, the guy states a claim if the laboratory animal has COVID-19 but the worker who has to feed the inmates and come in contact with coronavirus doesn't state a claim, absurd results. The regulations and the example first of all, there are two examples as Your Honor, Judge Chen pointed out, there's only two examples and only in the EDP regulation and only in the high degree part of the EDP regulation. Those non-exhaustive examples that do talk about working in a biological setting should not serve to cancel us. Let us put on our proof. Let us prove that these workers were the exact workers that Congress meant to protect, provide extra pay for in the words of Adair, if you go back and look at Adair, the words of Adair, performing their regular duties under unusually hazardous conditions. Thank you. Any more questions? Thank you judges. Thank you. Thanks to both counsel. The case is taken under submission.